670 So.2d 12 (1995)
KERR-McGEE CHEMICAL CORPORATION
v.
Ed BUELOW, Jr., Chairman and Commissioner of Revenue, and the Mississippi State Tax Commission.
No. 94-CA-00881-SCT.
Supreme Court of Mississippi, En Banc.
December 21, 1995.
Rehearing Denied March 14, 1996.
*13 Jamie G. Houston, III, Robert A. Miller, Frank A. Wood, Jr., Watkins & Eager, Jackson, for appellant.
Brenda G. Cameron, Bobby R. Long, Jackson, for appellee.
SMITH, Justice, for the Court:
This case of first impression comes to this Court from the Chancery Court of Hinds County on appeal of Kerr-McGee Chemical Corporation (KMCC) who claims that it is entitled to a tax refund based on the premise that certain electricity purchased from the Tennessee Valley Authority (TVA) from November 1, 1986, through July 31, 1990, was used as a raw material in its electrolytic processes, thereby exempting KMCC from Mississippi sales and use taxes. KMCC claims that the electricity was combined with certain chemical solutions in the electrolytic cells to create the products of sodium chlorate and manganese metal. Thus, this Court must determine whether the electricity was a raw material or a catalyst and not subject to taxation under the spirit of Miss. Code Ann. § 27-65-101 and § 27-67-7 (1972), as argued by KMCC.
The Mississippi State Tax Commission contends that all of the electricity used by KMCC is energy and meant to bring about end products in the electrolytic process; since by definition electricity is energy and has no mass or space, it cannot be a raw material.
The chancellor agreed with the Tax Commission and found that because she could not find a legislative intent to include electricity in the exemption provided for raw materials, electricity used in the electrolytic cell processes should be revisited by the legislature to clarify its intent under Miss. Code Ann. § 27-65-101(1)(b) (1972). The chancellor also held the statute of limitations issue as moot as to what period of time KMCC could claim a refund in the event it was awarded the refund sought. KMCC appeals to this Court citing two issues:
I. WHETHER ELECTRICITY IS A RAW MATERIAL SUBJECT TO SALES AND USE TAX EXEMPTION UNDER MISS. CODE ANN. § 27-65-101(1)(B) (1972).
II. IN THE EVENT THE REFUND SOUGHT IS GRANTED, WHAT IS THE APPLICABLE STATUTE OF LIMITATIONS ON SUCH REFUND UNDER MISS. CODE ANN. § 27-65-42 (1972).

FACTS
Kerr-McGee Chemical Corporation owns and operates a chemical manufacturing facility *14 located in Hamilton, Mississippi. There, KMCC produces several chemicals which are sold to other manufacturers for further processing. By a letter dated December 14, 1989, the Tax Commissioner notified KMCC that an examination had been initiated of certain sales and use tax returns filed on and after December 14, 1986, since the statute of limitations applied to any returns filed after that date. On August 13, 1990, the Commissioner made an assessment of an additional use tax in the amount of $96,510.72 plus interest and damages in the amount of $18,444.35, for a total of $114,955.07. This assessment covered the period of November 1, 1986, to May 31, 1990.
On September 24, 1990, KMCC made a timely application for a hearing before the Board of Review for correction of the amount of tax assessed. In conjunction with said application, KMCC also submitted to the Board of Review a claim for refund of certain use taxes erroneously paid by KMCC on certain electricity used in the plant's electrolytic process. The claim for refund was for the amount of $605,590.04, and it covered the period November 1, 1986, to July 31, 1990. This amount was based upon a representative percentage figure for usage of electricity attributable to the two electrolytic manufacturing processes within the Hamilton plant. This claim was later revised to a figure totaling $618,387.58.
A hearing was held before the Board of Review on December 3, 1990, at which the Board heard both KMCC's and the Commissioner's arguments. Subsequently, the Board issued an order dated January 15, 1991, in which it reduced the initial use taxes assessment to $108,020.28, from the earlier $114,955.07, and denied KMCC's unrelated refund claim in the amount of $605,590.04 for the period of November 1, 1986, to July 31, 1990.
The Board's decision was then timely appealed to the Mississippi Tax Commission, for a hearing on both the original assessment and the denial of refund. On May 1, 1991, the Commission heard arguments, and on May 6, 1991, the Commission affirmed the Board of Review on both issues. KMCC has paid in full the costs of the initial assessment. Having exhausted all administrative remedies, KMCC filed in Hinds County Chancery Court for a review of the Commissioner's denial of KMCC's claim for a refund of $618,387.58, plus interest thereon. The chancellor affirmed the Commission's denial of a refund, initiating this appeal.
At the Hamilton facility, KMCC utilizes two electrolytic manufacturing processes[1] to manufacture the products of sodium chlorate, hydrogen, manganese metal, sulfuric acid, and oxygen.
An electrolytic process is a process that produces a chemical change by the passage of an electric current through a substance, i.e., a chemical solution.[2] In the electrolytic *15 process, electricity is used as a raw material/reactant, which enters into and is altered in the course of the chemical reaction. Thus, electricity is used in the manufacturing process by directly causing the formation of the chemicals manufactured and in this process becoming converted into chemical energy within the chemicals or elements manufactured.
In the operation of the electrolytic cells, KMCC uses electricity purchased from TVA. A significant portion of the electricity is "used in the electrolytic process" for the purpose of manufacturing certain chemicals, and a small remainder is "used to fuel the electrolytic process."
KMCC's basic contention is that the electricity used by it in the electrolytic process to produce sodium chlorate and manganese metal constitutes a raw material or a catalyst and is therefore exempt from Mississippi sales tax under Miss. Code Ann. § 27-65-101(1)(b)[3] and thereby exempt from Mississippi use tax under Miss. Code Ann. § 27-67-7.[4] KMCC did not ask for an exemption for the electricity used for its administrative offices, burning lights, running motors, energy to run the cells or machines, or for the electricity expended in running its third sub-plant at the Hamilton facility. Moreover, no exemption is being sought for the electricity used in the manganese or sodium chlorate plants to make lights burn, power motors, run fans or heating and cooling equipment. KMCC claims that approximately 88-89% of the electricity introduced into the electrolytic cell is actually used in the process and only 10% is used to power the cell machinery. KMCC asks for an exemption only for that portion of the electricity used as an element in its two electrolytic processes; otherwise it argues taxing such electricity is tantamount to a value added tax. KMCC relies on the fact that electricity is not an end product, and suggests that the spirit of the law is meant only to tax the end product and to exempt ingredients used directly in manufacturing the product. KMCC also explains its position by comparing such electricity to certain enumerated exempt items, and by using industry standards that define electricity as a raw material when used in the electrolytic process.
The Mississippi State Tax Commission contends that the electricity is not entitled to an exemption because Webster's and classical science do not define it as a "raw material." The Commission believes that the electrical power or energy purchased "drives the reaction" or "causes it to happen" by pushing the flow of electrons into the cell. It was argued in the lower court that it is the electrons that should be considered the raw material, and since KMCC does not purchase electrons *16 from TVA and no electrons from TVA end up in the final product, the electricity cannot be considered raw material. In essence, the Tax Commission's argument is that electricity is not the raw material, but it causes a reaction in the raw materials. However, in the same breath, the Tax Commission admits that "a portion of the energy purchased from TVA finds its way into the final product."
The lower court held that KMCC failed to prove either by the preponderance of the evidence or by clear and convincing evidence that electricity is a raw material within the meaning of Miss. Code Ann. § 27-65-101(1)(b). The chancellor did not discuss the statute of limitations question and for its findings of fact and conclusions of law, the lower court adopted the Tax Commission's findings of fact and Conclusions of Law verbatim. KMCC appeals on both the exemption and the statute of limitations issue.

DISCUSSION OF LAW
Generally, both the chancery court and the supreme court are limited in appellate authority to review actions of the State Tax Commission under the arbitrary and capricious standard. Miss. State Tax. Com'n. v. Jenkins, 624 So.2d 91, 92 (Miss. 1993). However, the Supreme Court will not defer to the Commission's interpretation of a taxation statute when the interpretation is repugnant to plain meaning thereof. Miss. State Tax Com'n. v. Dyer Inv. Co., Inc., 507 So.2d 1287 (Miss. 1987).
This Court's review of a chancellor's findings of fact is the manifest error/substantial evidence rule. Miss. State Tax Com'n v. Medical Devices, 624 So.2d 987 (Miss. 1993). This Court reviews law application de novo and our scope of review is plenary. Id. at 989. Moreover, findings of fact and Conclusions of Law prepared by counsel and entered verbatim by a court are viewed "with a more critical eye to insure that the trial court has adequately performed its function." Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss. 1987).
Involved here is the construction of an exemption statute, Miss. Code Ann. 1972, § 27-65-101. The proper rule of construction, then, is the one relied upon by the chancellor that the "presumption is in favor of taxing power, and burden is on the claimant to prove or establish clearly his right to exemption... ." Miss. State Tax Com'n v. Medical Devices, Inc., 624 So.2d 987, 990-91 (Miss. 1993). We have utilized that rule in construing the very section here at issue. Fuel Services v. Rhoden, 245 So.2d 600 (Miss. 1971) (construing Miss. Code Ann. § 10116 (1942) which is now Miss. Code Ann. § 27-65-101 (1972). In Fuel Services, this Court stated that "an asserted tax exemption is to be construed strictly against the one who asserts a claim of exemption." Id. at 602.
This is a case of first impression for this Court presenting the question of whether electricity can be considered a raw material under Miss. Code Ann. § 27-65-101(1)(b) (1972), for the purposes of giving effect to the aim of the statute  to tax just the end product. First, we must determine the legislative intent behind the exemptions in Mississippi's Tax Exemption Statute, Miss. Code Ann. § 27-65-101 (1972). From the plain language of the statute, it appears that the legislature wished for taxes levied under Chapter 27 not to apply to manufacturers who bought raw materials, catalysts, processing chemicals, welding gases, or other industrial processing gases (except natural gas) for use directly in manufacturing or processing a product for sale, unless one of those properties was used as a fuel.
The Mississippi State Tax Commission's Regulations, Rule Number 47, only adds to the confusion by stating that "[p]urchases by manufacturers of raw materials which become a component part of the finished product, or catalysts, chemicals or gases used directly in processing (except natural gas or items used as a fuel) are exempt from sales or use tax." Sales and Use Tax, Law and Regulations, State Tax Commission 215 (1993) (emphasis added). Yet, Rule 47 also states that purchases of "electric power or other fuel ... used directly in the manufacturing process are taxable at the special 1.5% rate of sales or use tax." Id.
From the legislative cacophony, the purpose of the law is somewhat unclear. In one *17 light, it is clear that the purpose of the laws and explanatory regulations is to allow a tax exemption for any element that will become a component part of the finished product, with that element being anything from a raw material to a chemical to an industrial processing gas to a catalyst. Yet, in another, it appears that electricity is not meant to be exempt from the taxation.
Having said all this, it is necessary to scrutinize the lower court's decision in light of the legislative intent. If it appears that the legislative statutes in question are unclear or ambiguous, then it is proper to proceed to rules of construction for the purposes of interpreting the statute. Clark v. State ex rel. Mississippi State Medical Ass'n, 381 So.2d 1046 (Miss. 1980) (where statute is plain and unambiguous, there is no room for construction, but where it is ambiguous, courts, in determining legislative intent, may look not only to language used, but also to its historical background, its subject matter, and purposes and object to be accomplished). The chancellor followed this rule of construction:
Since taxation is the rule and the exemption is the exception, and since exemptions from taxation are not favored, general rule is that a grant of exemption from taxation is never presumed; on the contrary, in all cases having doubts as to legislative intention, or an to inclusion of particular property within the terms of statute, presumption is in favor of taxing power, and burden is on claimant to prove or establish clearly his right to exemption, bringing himself clearly within the terms of such conditions that statute may impose.
Miss. State Tax Com'n v. Medical Devices, Inc., 624 So.2d 987, 990-91 (Miss. 1993). The Chancellor is correct that there are several cases supporting this rule of construction.
Based on the rule of construction the chancellor chose, she reached the conclusion that had the legislature intended to include electricity as exempt, it would have so provided. When interpreting a statute, "[t]he proper way to determine the real intent of the legislature is to study the words used by it in context." Back-Acres Country Club, Inc. v. Miss. State Tax Com'n, 216 So.2d 531, 534 (Miss. 1968). See also City of Natchez v. Sullivan, 612 So.2d 1087 (Miss. 1992) (whether statute is ambiguous or not, ultimate goal of court in interpreting statute is to discern and give effect to legislative intent); Aikerson v. State, 274 So.2d 124 (Miss. 1973) (Supreme Court will give effect to the intent of the legislature and statutory law even though interpretation may go beyond letter of law).
There are essentially three requirements of XX-XX-XXX(1)(b):
(1) the user be a manufacturer
(2) that the ingredients (raw material, catalyst, processing chemicals, welding gas or industrial processing gas) be "used directly in manufacturing or processing a product,"
(3) that the ingredients (raw material, catalyst, processing chemicals, welding gas or industrial processing gas) not be used as a fuel.
The first requirement of KMCC being a manufacturer is undisputed. The second requirement is partially met because the chancellor's findings of fact states that a portion of the energy "finds its way to the finished products." The third requirement that electricity not be used as a fuel is debatable. Thus, the issue that the chancellor sought to answer is whether electricity can fall into one of the exempt ingredient categories  i.e. a raw material.
The meaning of the term raw material could not be determined from the context of the statutes, therefore the chancellor was required to determine the popular meaning of the term.
The chancellor's analysis followed the procedural process set forth by this Court in Lambert v. Ogden, 423 So.2d 1319 (Miss. 1983). The issue presented in Lambert was whether or not a workover rig was to be taxed at a 5% rate as tangible personal property or at a 3% rate levied on trucks. The Court first had to answer the question: what is a truck? This Court utilized Webster's Third New International Dictionary to ascertain the popular meaning of the work truck because the statute failed to define the term. Id. at 1322.
*18 The chancellor looked at the dilemma not in terms of what purpose the legislature was trying to effect, but rather whether electricity under popular definitions or classical science could be considered a raw material. The chancellor decided that since the tax statutes did not define "raw material," she would refer to the popular sense of the term by citing Webster's Third New International Dictionary (1971):
Raw material (noun): a material available, suitable or required for manufacture, development, training or other finishing process but not yet so used.
Material (noun) 1a(1): the basic matter (as metal, wood, plastic fiber) from which the whole or the greater part of something physical (as a machine, tool, building, fabric) is made... .
The chancellor thus reasoned that matter refers to something physical, and since matter makes material, a raw material refers to some physical, tangible element.[5]
Only two courts appear to have addressed this very question of whether electricity is a raw material and the seminal case of the two has concluded that electricity in the electrolytic process is a raw material for the purposes of exemption from taxation. See In the Matter of the Petitioner of Olin Corporation, 1990 WL 204901 (N.Y.Div.Tax App.) (where the New York Administrative Tax Court differentiated between electricity used to power the production equipment in an electrolytic process, and electricity absorbed/consumed by the chemical reaction in the electrolytic process).
Some states have even chosen to statutorily authorize the exemption of electricity in an electrolytic process. Ala. Code § 40-21-83(5) (1975) (exempting the furnishing of electricity to a manufacturer or compounder for use in an electrolytic or electrothermal manufacturing or compounding process); Ark.Stat. Ann. § 26-52-401(12)(B), (24) (1992); Del. Code Ann. 30 § 5506(g) (1994); Texas Tax Code § 151.317(a), (c)(2)(A)(iv) (1992); W. Va. Code § 11-13-2d(a)(3) (1991). However, it is noteworthy that of these states which authorize by statute the exemption of electricity in the electrolytic process, not one does so based on how many transformers were used or the amount of voltage. We also note that in 1988 Delaware decided to change its laws to include electricity as a raw material.
In Olin, the New York Administrative Tax Court gave the clearest pronouncement touching upon the issue presented this Court by this case. That court found that:
[t]he part played by electrical power in the production of chlorine, hydrogen and caustic soda through the electrolytic process differs significantly from the function of electrical power flowing through the substations in production of HTH sodium chlorite, and liquid chlorine. In the latter instance ... electricity simply powers production equipment... . In the former instance, electrical power causes a chemical reaction, is absorbed by the reactants and becomes part of the chlorine, hydrogen and caustic soda which is ultimately produced by the reaction. Electrical power associated with the rectifier units thus has a more intimate nexus with production than electrical power associated with the substations. (citations omitted).
Olin, 1990 WL 204901 at 6. Perhaps more important than the Olin court "conclud[ing] that electricity is a raw material in the electrolytic process," is its taking judicial notice of the fact that
over 90 percent of the incoming electrical power to the petitioner's facility passes through to the rectifier units where it is consumed [absorbed] in the electrolytic process. The equipment in question thus conveys electrical power from the Pennsylvania transformer to the rectifier units where, through the electrolytic process, the electrical power causes a chemical reaction which ultimately results in chlorine, hydrogen and caustic soda.

Olin, 1990 WL 204901 at 6.
Olin treats electricity as a raw material when used in an electrolytic process. It differentiates that electricity in an electrolytic process *19 has two functions: (1) to power the electrolytic cell, and (2) to combine with other chemicals to form certain compounds. More over, the 90% percent figure jotted by the tax court gives credence to KMCC's contention that around 88%-89% percent of the total kilowatt hours are used directly in the production of manganese metal and sodium chlorate. Apparently, a meter is attached to each of the electrolytic cells, and said meter determines the amount of electricity used as an element in the electrolytic process.
During oral argument, the Tax Commission argued that this Court should consider the other case on this topic, Olin Corp. v. Marcus E. Collins, Revenue Commissioner, and the State of Georgia, No. 89-RCCV-949 (Ga.Super.Ct., Richmond County, May 20, 1991), wherein Olin Corporation sought a tax refund under Ga.Code § 48-8-3(35)(A). There, the Georgia trial court concluded that electricity could not be tax exempt when used as power in a mercury cell process. The Georgia trial court also focussed on the fact that the electricity was put through transformers before entering the mercury cell electrolytic process. The record in the case at bar also indicates that the electricity entering the Hamilton plant electrolytic process was put through transformers, and was thereby changed in voltage. TVA's energy was transmitted to KMCC through TVA's alternating current (a/c) circuit via the flow of electrons. TVA's high voltage circuit lines entered KMCC's facility and passed through KMCC's facility and passed through their first transformers. The voltage was stepped down at the transformer. The energy then was passed through KMCC's second transformer and again the voltage was stepped down. Depending upon the area of the plant to which this energy was being directed, the electrical energy either passed through yet another transformer or passed through a rectifier and then went to the electrolytic cells. The alternating current was converted by a rectifier to a direct current.
The chancellor determined that KMCC's manganese process utilized the energy of natural gas to increase the energy level in the ore and alter the chemical state of the ore. The higher energy manganese was dissolved in sulfuric acid, mixed with water and placed in an electrolytic cell. Electrical energy was conducted through the (d/c) circuit encompassing the cell via the flow of electrons in the wires and via the flow of ions in the manganese solution. The energy is what forces the electrons and ions to move. As a direct result of the energy forcing the ions to move, two electrons attach to a manganese ion to form elemental manganese at the cathode while simultaneously two electrons are released at the anode during the formation of the oxygen gas.
The chancellor's review of the role of electrical energy in KMCC's electrolytic cells confirms that energy is not matter. Thus the chancellor concluded that the electrical energy was not a raw material. Even KMCC's basic theory that electricity was a raw material is flawed. Electricity is pure energy. Electrical energy fuels the reactions in the electrolytic cells by forcing the electrons in the circuit and the ions in solution to move just as a force is required to turn a rotor.
KMCC cannot alter fundamental laws of science that absolutely hold electricity to be energy, define energy as the ability to do work, measure energy through an energy balance while raw materials are held to be matter.
In Olin Corp. v. Collins, the Georgia trial court noted that Georgia law states that electricity cannot be deemed an industrial material when used as a "power." While the Mississippi statutes does not make exemption of electricity as a raw material contingent upon whether it is "power," it does make it contingent upon not being used as a fuel. Miss. Code Ann. § 27-65-101(1)(b). Also, § 27-65-19 uses the term "electricity, current, power ... for industrial power." The words power, fuel and energy have similar popular meanings.
It is clear to this Court that electrical energy fuels the processes by forcing the movement of the ions in the electrolyte solution. Therefore, we hold that electricity is not a raw material. The chancellor's use of the dictionary for common usage and terminology was certainly proper absent any definition provided by the legislature. The legislature *20 could have exempted specifically electricity had it chosen to do so. We do not choose to infringe upon the authority of the legislature. The chancellor was not manifestly in error. There is no merit to this issue.

IN THE EVENT THE REFUND SOUGHT IS GRANTED, WHAT IS THE APPLICABLE STATUTE OF LIMITATIONS ON SUCH REFUND UNDER MISS. CODE ANN. § 27-65-42 (1972).
This issue was moot in the eyes of the lower court. This Court finds that the Commission properly followed the procedure set forth in Miss. Code Ann. § 27-65-42 to toll the statute of limitations in its notification to KMCC. We hold the issue to be moot.

CONCLUSION
Both the Tax Commission and Kerr-McGee present compelling arguments in this very close question. When interpreting an unclear statute, this Court in interpreting a statute, must determine legislative intent. Here, the purpose of Miss. Code Ann. § 27-65-101(b) (1972) is to exempt from taxation elements (raw materials, catalysts, processing chemicals, welding gases or other industrial processing gases except natural gas). Electricity in the case sub judice was being used as power, energy or fuel, in the electrolytic process. This Court construes electricity thus as not being a raw material as contemplated under Miss. Code Ann. § 27-65-101(b), therefore, it is subject to sales and use taxes. The legislature could have exempted electricity, but did not do so. We must affirm the chancellor.
JUDGMENT AFFIRMED.
DAN M. LEE, C.J., PRATHER and SULLIVAN, P.JJ., and PITTMAN, BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ., concur.
MILLS, J., not participating.
NOTES
[1] One process involves a manganese electrolytic cell, which produces the chemicals of elemental manganese metal, sulfuric acid and oxygen gas. The other process involves a chlorate electrolytic cell, which produces sodium chlorate and hydrogen gas. About 88% of the number of kilowatts used in the production of manganese metal are used in its electrolytic process. About 89% of the number of kilowatts used in the production of sodium chlorate are used in its electrolytic process.

In the production of elemental manganese, electrons from the electricity are embedded within and become an integral part of the manganese metal that is produced. Here, a manganese sulfate solution is subjected to electricity so that the electricity splits the manganese sulfate molecule into elemental manganese and sulfate ion. It also splits the water molecule into hydrogen ions and oxygen. The hydrogen ions and the sulfate ions then combine to form sulfuric acid.
In the production of sodium chlorate, the raw materials are common salt, water and electricity. The electricity is used to split the water molecule into its two elemental components: hydrogen and oxygen. It also promotes a change in the chlorine in the salt so that the oxygen released from the water can combine with the sodium chloride in the salt to form sodium chlorate.
[2] The chemical change is one in which ions within a solution gain or lose electrons. Electricity is an essential raw material as it is the source of electrons absorbed by positively charged ions, and without it, the chemical reaction would not take place. The chemical reaction converts the electricity into chemical energy within the neutral chemical molecules or atoms formed by the electrolytic process. There is a direct relationship between the amount of electricity introduced into the chemical solution and the amount of product produced by virtue of the electrochemical reaction.

The process is carried out in an electrolytic cell. This is an apparatus consisting of a compartment (or sometimes several compartments) holding the chemical solution, a positively charged electrode (the anode) and a negatively charged electrode (the cathode) held apart and dipped into a solution containing positively and negatively charged ions. Electric current (i.e., the electrons) enters the solution in the cell through the negative charged cathode. Positively charged ions in the solution travel to the cathode, combine with the electrons, and become neutral atoms or molecules. The negatively charged ions in the solution migrate to the anode, give up electrons, and are transformed into neutral atoms or molecules.
[3] Section 27-65-101(1) provides, in pertinent part, an exemption for certain items sold to manufacturers:

The tax levied by this chapter [Chapter 65 on Sales Tax] shall not apply to the following:
(b) Sales of raw materials, catalysts, processing chemicals, welding gases or other industrial processing gases (except natural gas) to a manufacturer for use directly in manufacturing or processing a product for sale... . This exception shall not apply to any property used as fuel except to the extent that such fuel comprises by-products which have no market value.
[4] Section 27-67-5(a) provides that the use tax rates be the same as the sales tax rates, which is 1.5% in the case of electricity under § 27-65-19. The use tax rate on nonexempt electricity is also 1.5%.

Section 27-67-5 levies a use tax for the privilege of using, storing or consuming within Mississippi any "tangible personal property," the possession of which is acquired in any manner. "Tangible personal property" is defined as "personal property perceptible to the human senses or by chemical analysis." § 27-67-3(i) (1990). Section 27-67-7(b) provides an exemption to the extent that sales of such personal property are exempt from sales tax. Thus, § 27-67-7(b) makes the sales tax exemption of § 27-65-101(b) applicable to use tax.
[5] See also, Webster's Third New International Dictionary (1971):

Material (adj.) (1) a (3): of, or relating to, or derived from matter as the constituent of the physical universe ([i.e.] force).